IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
July 17, 2007 Session

## STATE OF TENNESSEE v. COURTNEY B. MATTHEWS

**Appeal from the Circuit Court for Montgomery County**
**No. 033791     John H. Gasaway, III, Judge**

---

**No. M2005-00843-CCA-R3-CD - Filed July 8, 2008**

---

In 1996, a Montgomery County Circuit Court jury convicted the defendant, Courtney B. Matthews,[1] of four counts of first degree felony murder and one count of especially aggravated robbery. The jury sentenced the defendant to a term of life in prison without the possibility of parole for each first degree murder conviction, and the trial court sentenced the defendant to a term of 25 years in prison for the especially aggravated robbery. The court ordered that all sentences be served consecutively. On appeal, the defendant contends: (1) that he was denied due process in the delay of the preparation of his trial transcript and of the hearing on the motion for new trial; (2) that the trial court erred in not reopening the hearing on the motion for new trial; (3) that the trial court erred by permitting cameras in the courtroom during the trial; (4) that the cameras "invaded" the deliberations of the jury; (5) that the trial court should have changed venue due to the influence of pretrial publicity; (6) that the trial court erred by admitting photographs of the victims; (7) that the trial court erred by admitting DNA evidence; (8) that the trial court erred by certifying a state witness as an expert in DNA analysis; (9) that the trial court erred by admitting the testimony of the medical examiner; (10) that the trial court erred by permitting the medical examiner to utilize demonstrative aids during his testimony; (11) that the evidence was insufficient to support his convictions under a theory of criminal responsibility for the conduct of another; (12) that the evidence was insufficient to support his convictions under a theory of direct liability; (13) that the trial court violated his due process rights by "forcing" the state to proceed on inconsistent theories at his trial and the trial of his codefendant; (14) that the trial court erred by interrupting jury deliberations to provide an instruction on criminal responsibility for conduct of another; (15) that the convictions for especially aggravated robbery and felony murder violate double jeopardy principles; (16) that the evidence was insufficient to support the finding that the murders were heinous, atrocious, or cruel; (17) that the trial court erred by failing to instruct the jury on certain non-statutory mitigating factors; and (18) that the trial court erred by imposing consecutive sentencing. Upon hearing oral arguments and reviewing the briefs of the parties, the extensive record, and the applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3; Judgments of the Circuit Court Affirmed**

---

[1] We believe the defendant spells his surname "Mathews," but the presentment spells the name "Matthews." This court customarily uses the spelling set forth in the charging instrument.

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and JERRY L. SMITH, J., joined.

J. Kevin Cartwright, Clarksville, Tennessee, for the appellant, Courtney B. Mathews.

Robert E. Cooper, Jr., Attorney General & Reporter; Elizabeth B. Marney, Senior Counsel; John Wesley Carney, Jr., District Attorney General; and Steven L. Garrett, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The convictions resulted from the 1994 robbery of a Clarksville Taco Bell restaurant and the slayings of four restaurant employees, Kevin Campbell, Angela Wyatt, Patricia Price, and Marsha Klopp. The evidence at trial established that in the early morning hours of January 30, 1994, the four employees were executed during a robbery of the restaurant. The defendant and David Housler were separately convicted of the murders and of especially aggravated robbery. *See State v. Housler*, 193 S.W.3d 476 (Tenn. 2006).

At trial, the defendant's roommate and fellow service member, Carl Ward, testified that on January 29, 1994, he held a barbecue for a friend at the duplex he and the defendant shared. He recalled that the defendant, who had taken a job at the Taco Bell to earn money to pay for damages to a friend's car, worked that evening and arrived at the duplex sometime between 8:30 and 9:30 p.m. The defendant went straight to his room, and Mr. Ward followed shortly thereafter. Mr. Ward recalled that the defendant, who was already wearing a "jogging suit," donned black denim pants, a white shirt, a tie, and a black denim, three-quarter length jacket over the other clothes. As he did so, the defendant remarked, "Pay attention people, you won't be seeing these clothes no more [sic]." After changing clothes, the defendant packed his nine millimeter handgun, a shotgun, and ammunition into a black book bag and told Ward that he was planning to take the guns to Nashville to sell them. Mr. Ward recalled that the defendant wore white surgical gloves as he loaded and packed the weapons. Just prior to leaving, the defendant removed his driver's license, bank card, and "other papers" from his wallet. The defendant then grabbed his bowling bag and said, "Just in case the cops stop me, just in case the police stop me, I'm going bowling."

On the following day, the defendant told Mr. Ward that a "Sargent Johnson" had telephoned to inform him about the Taco Bell murders. Mr. Ward recalled that the defendant then "broke down crying" and told him "[t]hat somebody had broke in and they hid in the ceiling." The defendant also stated that 30 shots had been fired from the same gun. When Mr. Ward inquired about the scratches on the defendant's face and the gasoline and grass stains on his shirt, the defendant said he lost his weapons, jacket, and wallet during a "scuffle" with three unknown assailants at a gas station. Mr. Ward identified a black jacket, bowling bag, shotgun and carrying bag, and a .25 caliber handgun as those the defendant possessed when he left their apartment on January 29, 1994.

On February 1, 1994, Mr. Ward returned home from work to find the defendant "very depressed." The defendant went to his room after giving Mr. Ward "a very emotional hug." Shortly thereafter, Mr. Ward called the defendant's name and when the defendant did not respond, went into the defendant's room. The defendant had attempted suicide by slitting his wrists with a box cutter. He told Mr. Ward, "I don't deserve to live. I ain't shit." As Mr. Ward tried to bandage his wounds, the defendant said that "he hurt four people, he killed four people."

Mr. Ward recalled that both he and the defendant had ejected shells from the nine millimeter handgun inside the apartment. He also recalled an incident when the defendant had fired several rounds into his bedroom floor. Mr. Ward remembered that the serial numbers had been scratched off the nine millimeter handgun and the shotgun.

Shawntea Ward, Mr. Ward's wife, testified that at the time of the crimes she lived with her husband, the defendant, and the defendant's girlfriend, Kendra Corley. Ms. Ward recalled that the defendant possessed a nine millimeter handgun, a .25 caliber handgun, and a shotgun at the time of the offenses. She stated that the defendant carried the nine millimeter "[a]lmost every time he left the house." She confirmed that the serial numbers had been obliterated. Ms. Ward testified that shortly before the offenses, the defendant had a fight with his wife, Yessica, who was visiting from New York. She stated that the defendant fired three shots into the bedroom floor with the nine millimeter.

Ms. Ward testified that on January 29, 1994, the defendant arrived home from work at approximately 9:00 p.m. and went to his room. Later, he asked to borrow her black bag, and she agreed. The defendant left the apartment approximately 45 minutes later, and Ms. Ward did not see him until the following morning. She remembered that the defendant got up at 9:00 a.m. and told her that "his squad leader had just called and said Taco Bell got robbed last night. He was going to see if Pat was alright." Ms. Ward said that she had not heard the telephone ring prior to the defendant's making that statement. The defendant returned an hour and a half later and asked to speak to Ms. Ward. He apologized for not returning her book bag and explained that he had been robbed in Nashville on the previous evening. The defendant told her that his bag, guns, jacket, and wallet had been taken in the robbery. As the two discussed the robbery of the Taco Bell, the defendant said, "Well, whoever did it, they went into Taco Bell before it closed and they went to the men's restroom and got up in the ceiling." When Ms. Ward expressed doubt that the ceiling would hold that much weight, the defendant responded, "[I]f you get along the wall area it would hold the weight of a person being up there." The defendant also told Ms. Ward that two victims had been found in the kitchen and two in the storage area. In addition, he stated that $700 to $800 had been taken and that the money in the drop box had not been taken. The defendant told Ms. Ward that the safe had been shot open with a shotgun and that the perpetrator "had gotten out through the back door because it doesn't have a key lock. It just latches." The defendant also stated that a nine millimeter and a shotgun had been used during the robbery and that some 30 rounds had been fired.

Ms. Ward recalled that after watching a televised press conference about the crimes, she confronted the defendant with her suspicion regarding his involvement. In response, the

defendant laughed and said, "If I would have did it [sic] I would have took all the money. I wouldn't have left any." The defendant also told Ms. Ward that the victims "would give up the money without any resistance" and that the panic buttons for the security system were not functioning at the time of the offenses. Ms. Ward remembered that two days later, she went to the mall with Ms. Corley and that Ms. Corley paid several bills and made numerous purchases with cash.

Clarksville Police Department Lieutenant Richard Hinkle arrived at the Taco Bell at approximately 8:00 a.m. on January 30, 1994. He observed four victims, three female and one male, in the employee-only area of the restaurant and noted that the "safe and office had been ransacked." In addition, a ceiling panel had "been broken and hanging down" in the women's restroom and a ceiling panel in the men's restroom "had been pushed back up over the rest of the panels" revealing an "opening in the ceiling." Lieutenant Hinkle recovered a heater or fan vent cover that had once been in the ceiling of the men's restroom and sent it to the Tennessee Bureau of Investigation (TBI) for forensic analysis. Lieutenant Hinkle testified that once he and other Clarksville officers realized the magnitude of the crime, they handed over evidence gathering and testing functions to the TBI. Lieutenant Hinkle estimated that 10 to 20 rounds had been fired inside the restaurant. He stated that he had not shared this information with anyone but other law enforcement officers.

Taco Bell shift manager John Arthur Ballard, Jr., testified that although he was not scheduled to work on the night of the offenses, he went to the restaurant at approximately 1:45 a.m. to check on Ms. Klopp because it was only her second time to work as closing manager. Mr. Ballard recalled that he went through the drive-thru and spoke to Ms. Klopp, who said that everything was okay but that they were running behind and that it would likely be 3:30 or 4:00 a.m. before they were able to leave. Mr. Ballard also recalled seeing Ms. Price cleaning. On the following morning, Mr. Ballard arrived to open the Taco Bell at 7:25 a.m. and saw a cardboard box in the drive-thru window. He also noticed that all of the employees' cars were still in the lot. When he went inside, he saw a body lying behind "the second employee door towards the rear of the building." Mr. Ballard stated that he ran out of the restaurant, locked the door behind him, and telephoned 911. Mr. Ballard let officers into the restaurant when they arrived, and then traveled to the police station to give a statement. Mr. Ballard stated that he had not shared his observations with anyone but law enforcement officers and Taco Bell management.

Shawn Joseph Depto testified that in September of 1993 he loaned the defendant a shotgun that he had received from his father. Mr. Depto's father testified that he had given the gun to his son and that it had been used primarily for hunting. He identified the shotgun recovered from behind the defendant's residence as the same one he had given to his son.

Fitz Dickson testified that he purchased a Taurus nine millimeter handgun for the defendant on December 22, 1993. Mr. Dickson recalled that the defendant wanted the weapon for home security and that after acquiring the weapon, the defendant carried it with him often. According to Mr. Dickson, he saw the defendant on January 30, 1994, and the defendant, who was crying, told Mr. Dickson that he was depressed because a friend had been murdered at the Taco Bell.

Taco Bell assistant manager Deann Marie Kellett testified that she hired the defendant on January 19, 1994. She recalled that as she gave the defendant a tour of the restaurant, the defendant asked a number of questions about the structure, the after-hours procedures regarding off-duty employees, and the closing procedure. The defendant also requested a key to exit the door opposite that used by other employees and asked if there were security cameras inside the restaurant. Additionally, the defendant questioned Ms. Kellet regarding the accessibility to the roof and asked what, if anything, was kept inside the drop ceiling. Ms. Kellet recalled that she answered each of the defendant's questions and provided him with the key he requested.

Shawn Peghee, who was in the defendant's Army unit, testified that he and the defendant worked together in the mail room at Fort Campbell. Mr. Peghee recalled that on the Friday before the offenses, the defendant, who was carrying a nine millimeter handgun, came to the mail room on his day off and asked to examine the safe. The defendant asked about ways to access the safe and specifically asked whether one could access the safe by shooting the dial with a shotgun. As they left the room containing the safe, the defendant told Mr. Peghee that "something big was going to happen" that weekend. Mr. Peghee testified that he spent the weekend in Nashville with his girlfriend and that when he returned to Fort Campbell on Monday morning, he heard about the murders at the Taco Bell. At that point, Mr. Peghee stated, "[I]t clicked in my mind that it was probably [the defendant] that may have done the Taco Bell murders."

Patrick Cooper, who attended a party on January 30, 1994 at the residence shared by the defendant and Mr. Ward, testified that the defendant arrived at the residence sometime between 8:00 and 8:30 p.m. and went to his room. Shortly thereafter, Mr. Cooper and Mr. Ward went to the defendant's room. Mr. Cooper recalled that a nine millimeter handgun and a shotgun, along with a black book bag, were on the defendant's bed. The defendant was wearing a "Miami Hurricanes" sweat suit and white surgical gloves as he wiped the fingerprints from the guns and placed them into the bag. He then put on black jeans, black boots, black gloves, and a black jacket over the sweat suit. The defendant told Mr. Cooper and Mr. Ward that he was taking the weapons to Nashville to sell them. The defendant explained that the change of clothes was in case "he got into trouble with the guns." The defendant also told them that they would never see those clothes again.

James Bowen testified that he attended a party at the Hillcrest Trailer Park on January 21, 1994. At this party, Mr. Bowen overheard the defendant say that "he was out looking for a good place to rob" and that "the easiest place to rob would be the Taco Bell." According to Mr. Bowen, the defendant said "it would be easy because nobody else would be around, it's open late at night, and he knew some of the people there and maybe they would let him in." Mr. Bowen recalled that Kevin Tween, David Housler, and an individual he knew only as "Box Train" participated in the conversation about robbing the Taco Bell.

Jelain Walker, who worked the 7:00 p.m. to midnight shift at the Taco Bell on January 29, 1994, recalled that when she clocked out shortly after midnight on January 30, the dining room was closed, the doors were locked, and there were no customers inside the restaurant. She stated that the defendant had worked earlier that evening and that she remembered seeing him

squatting near the trash cans after he had clocked out. When she said, "I thought you were gone," the defendant responded, "I am gone. You don't see me." Ms. Walker stated that she never actually saw the defendant leave the Taco Bell.

Yowanda Maurizzio testified that she drove by the Taco Bell at approximately 1:10 a.m. on January 30, 1994, and saw a light-skinned black woman and a black male wearing Taco Bell uniforms sitting at a table in the dining area of the restaurant. Frankie Sanford testified that he placed an order at the drive-thru at 1:30 a.m. He recalled that Mr. Campbell, with whom he was acquainted, took his order. He also recalled seeing three female employees and a black male, whom he identified as the defendant, standing near the counter. Mr. Sanford stated that the employees did not appear to be in any distress. Allen Ceruti testified that at approximately 4:25 a.m., he passed the Taco Bell on his way to work and saw a black male appear briefly at the back door of the restaurant. James Phinnesse testified that he and the defendant were the only black males employed at the Taco Bell at the time of the offenses and that he did not work on January 29 or 30.

A black hooded jacket identified as that belonging to the defendant and a pair of white surgical gloves were found on the bank of the Red River. TBI forensic scientist Deane Johnson examined the jacket and testified that stains on the coat tested positive for blood. Forensic DNA analyst Richard Guerrieri performed Polymerase Chain Reaction testing on the cutting from the black jacket. The testing established that the blood on the jacket belonged to Mr. Campbell.

TBI forensic scientist Larry Hall lifted fingerprints from the door facing and the exhaust fan cover in the men's restroom of the Taco Bell. Agent Hall testified that the print on the exhaust fan cover matched the left middle finger of the defendant. TBI forensic scientist Hoyt Phillips testified that he matched latent prints on the vent cover and door facing with the defendant.

TBI microanalysis forensic scientist Sandra Evans compared black plastic fragments taken from the front of the safe area inside the Taco Bell with black plastic fragments taken from the defendant's black jacket. Ms. Evans testified that the fragments came from the same object. Additionally, Ms. Evans examined the bowling ball bag found in the backseat of the defendant's car and found $2,576 under a panel in the bottom of the bag. The bag also contained bowling-related items.

Sharie Underwood, Team Unit Manager for Taco Bell at the time of the offenses, testified that in January 1994, only two black males were employed at the Riverside Taco Bell. She confirmed that $2,967.68 was taken during the robbery and that $754 was left in the front register drop box. Ms. Underwood testified that only managers had keys to the drop box. Ms. Underwood recalled that on the day before the murders, the defendant asked her whether exiting through the back door would set off an alarm, and she told him no.

David Lee Rose worked a 3:00 a.m. to noon shift at the McDonald's located near the Taco Bell on January 30, 1994. He recalled that shortly after daybreak, he went to empty the trash cans in the parking lot. As he emptied one of the cans, the bottom of the bag burst, and shotgun

shells and nine millimeter shells fell to the ground. He also found a black wallet, black glove, and several coin wrappers. Mr. Rose stated that he originally gave the nine millimeter shells to a coworker and kept the shotgun shells for himself. When he heard about the crimes at the Taco Bell, he turned the ammunition over to his supervisor, who then turned it over to police.

TBI firearms examiner Daniel Royse testified that he arrived at the Taco Bell on January 30, 1994, and spent more than 17 hours on the scene. During that time, Agent Royse recovered "eight fired bullets that were all nine millimeter lugers. Forty bullet projectile fragments. Twenty-four nine millimeter cartridge cases, and one fired .12 gauge shot shell case and one live .12 gauge shotshell." The markings on the fired bullets and cartridge cases were consistent with a 1992 model Taurus or Beretta nine millimeter and indicated that they had been fired from the same weapon. Two of the bullets recovered from the Taco Bell matched bullet fragments recovered from the defendant's bedroom floor. A cartridge casing found in the defendant's room matched the twenty-four casings found at the Taco Bell. A bullet recovered from the neck of Mr. Campbell and a bullet fragment recovered from the body of Ms. Klopp had been fired from the same gun as those discovered in the defendant's apartment. Agent Royse testified that a rifle slug shotgun shell had been used to shoot the dial on the Taco Bell safe and that the shell and shell case recovered from the Taco Bell bore the same mechanism marks as those found at McDonald's. Agent Royse explained that they had been loaded and chambered in the same shotgun. The mechanism marks were attributed to the shotgun given to the defendant by Mr. Depto and recovered under an old sofa behind the defendant's residence.

Doctor Charles Harlan performed the autopsies of the victims. Doctor Harlan testified that Mr. Campbell died of multiple gunshot wounds. He explained that Mr. Campbell suffered a "tight contact gunshot wound" just above the right ear that passed through the brain causing immediate loss of consciousness and nearly instant death. A second gunshot wound struck Mr. Campbell on the right side of the face slightly above the jaw line; this wound did not cause unconsciousness and was not fatal. Doctor Harlan testified that gunshot wounds to Mr. Campbell's chest, upper arm, and hand were not fatal. He classified the wounds to Mr. Campbell's arms and hand as defensive wounds.

Ms. Wyatt suffered gunshot wounds to the head, face, shoulder, and leg. Doctor Harlan testified that the gunshot wound to Ms. Wyatt's head was fired from a distance of four to six inches, passed through the brain, and was fatal. Gunshot wounds to her cheek, shoulder, and leg were fired from greater than 24 inches. The cause of Ms. Wyatt's death was a "near gunshot wound to the head, secondary to multiple gunshot wounds."

Ms. Price suffered two gunshot wounds to her head, one to the "right side of the head below the right ear," and one to the back of the head that exited to the left of her mouth. Doctor Harlan classified these wounds as "tight," meaning that "the muzzle of the gun [was] pressed tightly against the skin's surface." Another gunshot struck her left forearm, passed through the arm, grazed the upper arm, entered the chest, passed through the lung, and exited below the shoulder blade. Doctor Harlan testified that that wound, which he classified as a defensive wound, would have

-7-

caused death within three to five minutes. A gunshot to her upper right arm passed through the right side of her chest. Other gunshot wounds to her left hip and left inner thigh were not fatal. Doctor Harlan explained that the cause of death was "multiple gunshot wounds to include a tight contact wound to the head and a gunshot wound to the chest."

Ms. Klopp suffered a "through and through" gunshot wound to her right forearm and a gunshot wound to the "outside portion of the right breast" that exited through her back. She also suffered a gunshot to the upper right breast that passed "through the aorta and esophagus and the right lung" before exiting through the shoulder. According to Doctor Harlan, this wound would have caused death in three to 15 minutes. Two gunshot wounds to the left chest passed through the heart and would have caused death within three to 15 minutes. A gunshot wound to her left inner thigh was not fatal.

Denise Foley testified on behalf of the defendant that she attended a party at the Hillcrest Trailer Park on January 21, 1994, and that the defendant was not there. Similarly, Shane Box testified that he had never attended a party at the Hillcrest Trailer Park with the defendant. The defendant's work records from the Taco Bell established that he worked from 6:23 p.m. to 3:14 a.m. on January 21, 1994.

Jacqueline Dickinson testified for the defense that she was driving by the Taco Bell at approximately 2:00 a.m. on January 30, 1994, when she saw the lights come on inside the restaurant. Ms. Dickinson stated that she looked inside the restaurant and saw a white male "around . . . five nine to six foot. He had a short hairstyle . . . like a military cut . . . . [H]e was a middle sized man." She said the man was standing at the counter but did not appear to be a Taco Bell employee.

The defense also entered into evidence a "charge agreement" signed by the State and David Housler which established that Mr. Housler had agreed to plead guilty to conspiracy to commit the murder of the Taco Bell victims.

In rebuttal, the State called Kimberly Pellino and Hector Ortiz, each of whom testified that the defendant attended a party at the Hillcrest Trailer Park prior to the murders at the Taco Bell. Deronda King positively identified the black jacket recovered near the Red River and tested by the TBI as that belonging to the defendant.

The Honorable Charles Bush, General Sessions Court judge, testified that prior to taking the bench, he had been the lead prosecutor in the Taco Bell murders. Judge Bush stated that the agreement between Mr. Housler and the State was terminated as a result of Mr. Housler's implicating an innocent person in the crimes. Judge Bush also stated that at the time the State entered into the agreement, the State "believed . . . that Housler was not the shooter involved." He testified that "the State never had any evidence placing David Housler inside the Taco Bell shooting anyone."

At the conclusion of the guilt phase of the trial, the jury found the defendant guilty as charged of the felony murders of Mr. Campbell, Ms. Klopp, Ms. Price, and Ms. Wyatt. The jury also convicted him of especially aggravated robbery.

During the penalty phase of the trial, family members of the victims testified as to the effect of the victims' deaths on the lives of their respective families. The defendant's sister, pastor, and several friends testified about the defendant's childhood and general good character.

At the conclusion of the penalty phase, the jury declined to impose the death penalty and instead imposed four sentences of life without parole on the basis of its findings that the murders were especially heinous, atrocious, or cruel in that they involved serious physical abuse beyond that necessary to produce death.

## I. Motion for New Trial[2]

The defendant contends that the nearly nine-year delay between the filing of the motion for new trial and the trial court's ruling on the motion resulted in the denial of his right to due process of law. In a similar vein, he argues that the trial court violated his right to the due process of law by refusing to reopen the motion for new trial proceedings to allow for the inclusion of certain issues and urges this court to remand the case to the trial court for that purpose. The State asserts that the defendant has waived these issues by failing to actively pursue a ruling on his motion for new trial, by failing to specify the nature of the "newly discovered" evidence he seeks to have admitted upon remand, and by failing to prosecute his "languishing" petition for writ of error coram nobis on the basis of this evidence.

A short review of the procedural history is in order. On September 12, 1996, the defendant filed a timely motion for new trial along with a request that the trial court defer any proceedings on the motion until after the preparation of the transcript. On October 23, 2000, one of the defendant's attorneys filed a motion to withdraw, which was granted by the trial court. In 2003, the trial court later re-appointed that same attorney to represent the defendant "to the conclusion of all trial court matters." On October 9, 2003, the State and defendant filed a joint motion to reschedule the hearing on the motion for new trial from October 16, 2003, to a date in December 2003. Although the order denying the motion for new trial indicates that the "matter was submitted on briefs in December 2003," the order also notes that an amended motion for new trial was filed by the defendant in January 2004. The motion for new trial was overruled without a hearing on March 15, 2005. On March 30, 2005, the defendant filed several pro se pleadings including a timely notice of appeal.

Although we do not condone the protracted delay between the filing of the motion for new trial and the ruling on the motion, we cannot say that the defendant's due process rights were violated by the delay. Most importantly, the defendant has failed to establish that he was prejudiced

---

[2]To facilitate our analysis, we have re-ordered and re-numbered the issues as presented in the defendant's brief.

by the delay. *Cf. State v. Dykes*, 803 S.W.2d 250, 255-56 (Tenn. Crim. App. 1990), *overruled on other grounds by State v. Hooper*, 29 S.W.3d 1 (Tenn. 2000) (determining that where there is a delay between arrest and indictment, a due process violation will be found where (1) there has been a delay, (2) it has caused the accused to suffer actual prejudice, and (3) the state caused the delay to gain tactical advantage or to harass the defendant). Moreover, it appears that the defendant and/or his counsel contributed significantly to the delay. The defendant asserts that the trial court should have inquired into the status of the motion but overlooks the fact that neither he nor his counsel inquired into the status of the motion for more than seven years. In addition, although he states that the defense was awaiting the preparation of a trial transcript, the defendant fails to acknowledge that other than the initial request filed with the motion for new trial, neither he nor his counsel took any further action to ensure the timely preparation of the transcript. "[A] party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error" is not entitled to relief. Tenn. R. App. P. 36(a).

We also hold that the trial court did not err by refusing to reopen the motion for new trial to permit the defendant to present other issues and "newly discovered evidence." Initially, no pleading contained in the voluminous record is captioned with a request to reopen the motion for new trial. Moreover, to the extent that any of the defendant's numerous pro se pleadings could be read as a motion to reopen the motion for new trial, these pleadings were filed either on or after the date of the filing of the notice of appeal in this court. Once the notice of appeal was filed, the trial court was without jurisdiction to take the action requested by the defendant. *See State v. Pendergrass*, 937 S.W.2d 834, 837 (Tenn. 1996) ("The jurisdiction of the Court of Criminal Appeals attaches upon the filing of the notice of appeal and, therefore, the trial court loses jurisdiction.").

## II. Cameras in the Courtroom

The defendant asserts that the trial court erred by permitting the video recording of the proceedings by the news media. He also contends that the trial court should have granted a mistrial when a camera "invaded the privacy and sanctity of the jury deliberations." The State argues that the defendant has failed to establish that he was prejudiced by the presence of the cameras and, as a result, that the trial court did not abuse its discretion.

This court has previously ruled that the trial court in this case did not abuse its discretion by permitting in-court cameras. In an extraordinary appeal filed by the defendant pursuant to Rule 10 of the Tennessee Rules of Appellate Procedure, and joined by the State and several media outlets, this court considered the trial court's decision to allow cameras in the courtroom as well as the limitations the trial court placed on the media. *See State v. Courtney B. Mathews*, No. 01C01-9605-CC-00177 (Tenn. Crim. App., Nashville, May 22, 1996). After concluding that Tennessee Supreme Court Rule 30 expressly permitted the use of cameras during a death penalty trial, this court ruled that the decision to allow cameras and what, if any, limitations to place on their use was within the sound discretion of the trial court. *Id.*, slip op. at 3. This court held that "the trial judge did not abuse his discretion in the decisions he has made in this highly provocative trial. The judge has endeavored to accommodate the interests of all the parties involved; and on the record

-10-

before us, this Court cannot find any abuse of discretion in this matter." *Id.*, slip op. at 5. Given that the defendant has presented no new evidence to support his assertion that the trial court should not have permitted cameras, we are bound by the law of the case to adhere to this earlier ruling.

Our supreme court addressed the law of the case doctrine in great detail in *Memphis Publishing Company v. Tennessee Petroleum Underground Storage Tank Board*, 975 S.W.2d 303 (Tenn. 1998):

> The phrase "law of the case" refers to a legal doctrine which generally prohibits reconsideration of issues that have already been decided in a prior appeal of the same case. In other words, under the law of the case doctrine, an appellate court's decision on an issue of law is binding in later trials and appeals of the same case if the facts on the second trial or appeal are substantially the same as the facts in the first trial or appeal. The doctrine applies to issues that were actually before the appellate court in the first appeal and to issues that were necessarily decided by implication. The doctrine does not apply to dicta.
>
> The law of the case doctrine is not a constitutional mandate nor a limitation on the power of a court. Rather, it is a longstanding discretionary rule of judicial practice which is based on the common sense recognition that issues previously litigated and decided by a court of competent jurisdiction ordinarily need not be revisited. This rule promotes the finality and efficiency of the judicial process, avoids indefinite relitigation of the same issue, fosters consistent results in the same litigation, and assures the obedience of lower courts to the decisions of appellate courts.
>
> Therefore, when an initial appeal results in a remand to the trial court, the decision of the appellate court establishes the law of the case which generally must be followed upon remand by the trial court, and by an appellate court if a second appeal is taken from the judgment of the trial court entered after remand. There are limited circumstances which may justify reconsideration of an issue which was issue decided in a prior appeal: (1) the evidence offered at a trial or hearing after remand was substantially different from the evidence in the initial proceeding; (2) the prior ruling was clearly erroneous and would result in a manifest injustice if allowed to stand; or (3) the prior decision is contrary to a change in the controlling law which has occurred between the first and second appeal.

*Id.* at 306 (citations omitted). In this case, none of the three exceptions to the doctrine apply. The evidence relied on by the defendant during the previous appeal is identical to that offered here, the prior ruling was not "clearly erroneous," and there has been no change in the controlling law. In consequence, the law of the case doctrine demands adherence to our previous ruling that the trial court did not abuse its discretion by allowing the in-court cameras.

Moreover, the defendant has failed to establish by some showing from the record that he was prejudiced by the presence of the cameras. The defendant makes a bare allegation that the presence of the cameras "caused the jury to clearly be influenced to convict for a reason other than consideration of the law and evidence," but he offers no evidence from the record to support this assertion. In addition, the defendant has failed to support his argument with citation to appropriate authorities. *See* Tenn. R. App. P. 27(a)(7); Tenn. Ct. Crim. App. R. 10(b).

The defendant also argues that he is entitled to a new trial because the camera "invaded the sanctity" of jury deliberations. In its order denying the motion for new trial, the trial court explained that the jury was permitted to use the courtroom for deliberations because of the large number of exhibits. The trial court ordered that the single, ceiling-mounted camera that was providing video feed for the media be pointed at the state seal. At some point, the court learned that a different image was on the camera. Defense counsel sought a mistrial claiming that, pursuant to Tennessee Rule of Appellate Procedure 36(b) the camera's recording images in the courtroom during jury deliberations resulted "in prejudice to the judicial process" and that relief was warranted without the showing of prejudice.

The trial court conducted an extensive hearing on the matter, during which several members of the media testified.[3] In general, the testimony showed that during jury deliberations from approximately 9:30 a.m. until approximately 3:00 p.m., the courtroom camera was focused upon the wall above the judge's chair. This image, which was not accompanied by any sound, was fed to monitors located in the courthouse media room and in at least two media trucks on the site. At some point, members of the media who were gathered in the media room wondered whether proceedings had resumed in the courtroom, and using a control device from the media room, the camera operator lowered the focal point of the camera approximately five feet to the judge's chair to determine that the judge had not returned to the courtroom. No one saw any jurors, exhibits, or any movement on the monitor. The camera operator testified that there was "no chance of seeing any movement in the center area or any part of the area except if someone sits in the Judge's chair." Testimony indicated that, although the downward pan of the camera could be observed by anyone watching the camera, the downward camera movement could not be heard. No one testified that any member of the jury was in the courtroom when the camera moved or that anyone in the courtroom was aware that the camera's focal point had been altered.

---

[3]The court has ordered, received, and reviewed a supplement to the record consisting of the transcript of the trial court's hearing and ruling on the issue.

At the conclusion of the hearing, the trial judge found that no evidence showed that the media's action "actually intruded into the deliberative function of the jury."

The record supports the trial court's conclusion that no intrusion occurred, and thus we are not obliged to determine whether the defendant bore a burden to show prejudice. No evidence established that any member of the jury was even aware of the incident. The evidence did not show that camera movements within the courtroom during deliberation impaired the jurors' ability to decide the case only on the evidence or that the trial was adversely affected by the impact of media coverage on one or more of the participants." *State v. Harries*, 657 S.W.2d 414, 419 (Tenn. 1983) (citing *Chandler v. Florida*, 449 U.S. 560, 581-82, 101 S. Ct. 802, 813 (1981)). Thus, the defendant is not entitled to relief on this issue.

## III. Venue

The defendant argues that the trial court erred by refusing to grant his motion for change of venue prior to trial. The State contends that the defendant has waived our consideration of this issue by failing to cite to the record and by failing to cite supporting authority. Because the defendant has cited to a case detailing the appropriate standard of review and made reference to pretrial motions regarding venue, we will address this issue.

The trial court has the discretion to determine whether to grant a change of venue. Its decision will be reversed only for a clear abuse of discretion. *State v. Davidson*, 121 S.W.3d 600, 611-12 (Tenn. 2003) (citing *State v. Dellinger*, 79 S.W.3d 458, 481 (Tenn.), *cert. denied*, 537 U.S. 1090, 123 S. Ct. 695 (2002)). "Moreover, before a conviction will be reversed for the trial court's failure to grant a change of venue, an accused must establish 'that the jurors who actually sat were biased and/or prejudiced.'" *Id.* at 612 (quoting *Dellinger*, 79 S.W.3d at 481); *see also State v. Mann*, 959 S.W.2d 503, 532 (Tenn. 1997); *State v. Melson*, 638 S.W.2d 342, 361 (Tenn. 1982).

Here, the jurors for the defendant's Montgomery County trial were selected from a Davidson County venire to avoid the effect of pretrial publicity on the jury. The trial court concluded that the Davidson County jurors were not exposed to the same level of pretrial publicity as was the populace in Montgomery County. The defendant has not even alleged, much less shown, that any of the Davidson County jurors who sat for his trial were biased or prejudiced. In consequence, he is not entitled to relief on this issue.

## IV. Photographs of Victims

The defendant contends that the trial court erred by admitting into evidence in situ photographs of the victims. The defendant does not complain about any specific photographs and argues only generally that photographs of the victims' bodies should not have been admitted because their only purpose was to "inflam[e] the passions of anger and sadness" of the jury. The State submits that the defendant has waived our consideration of the admissibility of all but exhibit 50, which is a photograph depicting the body of Ms. Price, by failing to challenge their admission in his

-13-

motion for new trial. The State, limiting its argument to this single photograph, contends that the trial court did not abuse its discretion.

The admissibility of photographs is governed by Tennessee Rules of Evidence 401 and 403. *See State v. Banks*, 564 S.W.2d 947, 949-951 (Tenn. 1978). Under these rules, the trial court must determine, first, whether the photograph is relevant. Tenn. R. Evid. 401; *Banks*, 564 S.W.2d at 949. Next, the trial court must determine whether the probative value of the photograph is substantially outweighed by the danger of unfair prejudice. Tenn. R. Evid. 403; *Banks*, 564 S.W.2d at 950-51. The term "unfair prejudice" has been defined as "'[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" *Banks*, 564 S.W.2d at 951. Photographs offered by the State must be relevant to prove some part of its case and must not be admitted solely to inflame the jury and prejudice it against the defendant. *Id.* Whether to admit the photographs rests within the sound discretion of the trial court, and the determination will not be reversed absent a clear showing of an abuse of that discretion. *Id*. at 949; *see also State v. Dickerson*, 885 S.W.2d 90, 92 (Tenn. Crim. App. 1993); *State v. Allen*, 692 S.W.2d 651, 654 (Tenn. Crim. App. 1985), *superseded by statute as stated in State v. Gilliam*, 901 S.W.2d 385, 391 n.5 (Tenn. Crim. App. 1995).

The record establishes that the only photograph to which the defendant objected at trial was exhibit number 50. Similarly, the defendant's challenge to the admission of photographs in his motion for new trial was limited to exhibit number 50. Accordingly, the defendant has waived our consideration of all but this photograph by failing to lodge a contemporaneous objection, *see* Tenn. R. Crim. P. 36(a), and by failing to raise the issue in a motion for new trial, *see* Tenn. R. App. P. 3(e). As to the single photograph at issue, we hold that the photograph was not so graphic as to inflame the jury or create the danger of unfair prejudice. Consequently, the defendant is not entitled to relief on this issue.

*V. Admission of DNA Evidence*

The defendant complains that the trial court erred by permitting the State to offer evidence regarding deoxyribonucleic acid (DNA) testing and identification. In a related issue, he contends that the trial court erred by qualifying Mr. Guerrieri as an expert in the field of DNA identification. Again, the defendant has failed to support his argument with any citation to authority and has, accordingly, waived our consideration of this issue. Tenn. R. App. P. 27(a)(7); Tenn. Ct. Crim. App. R. 10(b).[4] In addition, the defendant has waived the issue regarding expert testimony by failing to lodge a contemporaneous objection to the qualification of Mr. Guerrieri as an expert in the field of DNA identification. *See* Tenn. R. Evid. 103(a)(1); Tenn. R. Crim. P. 36(a). Moreover, other than bare allegations of error, the defendant has failed to indicate how the admission of DNA identification evidence ran afoul of any evidentiary rule or principle of law. Similarly, he has failed to show from any evidence in the voluminous record that Mr. Guerrieri was not properly

---

[4]Although the defendant filed a reply brief in this case, he did not supplement this, or any other issue, with further argument or citation to authorities.

qualified to testify as an expert. He has not attacked the witness's credentials or experience. *See generally* Tenn. R. Evid. 702, 703. Accordingly, he is not entitled to relief on either of these issues.

### VI. Doctor Charles Harlan

The defendant next contends that the trial court erred by permitting the testimony of Doctor Harlan regarding the number of wounds suffered by each victim and by permitting Doctor Harlan to utilize charts, notes, and demonstrative aids during his testimony. The defendant specifically complains that the testimony and its accompaniments were irrelevant. Again, as the State correctly points out, the defendant has not cited any authority in support of his position. *See* Tenn. R. App. P. 27(a)(7); Tenn. Ct. Crim. App. R. 10(b). Further, the defendant has waived consideration of the admission of Doctor Harlan's testimony by failing to challenge it in his motion for new trial. *See* Tenn. R. App. P. 3(e). In addition, the record establishes that the defendant has waived this issue because he did not challenge admission of the charts, notes, and demonstrative aids on the basis of relevance but instead argued under Tennessee Rule of Evidence 403 that they were cumulative. *See State v. Adkisson*, 899 S.W.2d 626, 634-35 (Tenn. Crim. App. 1994) (holding that a defendant may not assert one ground for relief in the trial court and then pursue a new or different theory on appeal). Moreover, other than making sweeping allegations that the testimony was irrelevant, the defendant does not point to any particular statement that was irrelevant to the issues at trial.

It is also unclear whether the defendant is challenging the admission of Doctor Harlan's testimony at trial or at the sentencing hearing. Although Doctor Harlan did not offer live testimony at the sentencing hearing, the State specifically adopted and utilized his trial testimony during the sentencing phase of the bifurcated proceeding. As to admissibility of the testimony during the guilt phase, Doctor Harlan's testimony established the cause and manner of death for each of the victims and was, therefore, relevant. *See* Tenn. R. Evid. 401.

As to the admission of the testimony during the sentencing phase, we would initially observe that the rules of evidence do not limit the admissibility of evidence in a capital sentencing proceeding. *State v. Stout*, 46 S.W.3d 689, 702 (Tenn. 2001) (citing *Van Tran v. State*, 6 S.W.3d 257, 271 (Tenn. 1999)). Code section 39-13-204 empowers "'trial judges [with] wider discretion than would normally be allowed under the Tennessee Rules of Evidence'" in the admission of evidence during the penalty phase of a capital case. *Id.* at 703 (quoting *State v. Sims*, 45 S.W.3d 1, 14 (Tenn. 2001). "The Rules of Evidence should not be applied to preclude introduction of otherwise reliable evidence that is relevant to the issue of punishment, as it relates to mitigating or aggravating circumstances, the nature and circumstances of the particular crime, or the character and background of the individual defendant." *Sims*, 45 S.W.3d at 14. Because Doctor Harlan's testimony meets these requirements, the trial court did not err by admitting this testimony.

*VII. Sufficiency of the Evidence*

The defendant asserts that the evidence is insufficient to support his convictions. When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S. Ct. 2781, 2791-92 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). The rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *Winters*, 137 S.W.3d at 654.

In determining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* at 655. Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

At the time of the offenses, first degree felony murder was defined as "[a] reckless killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse or aircraft piracy." T.C.A. § 39-13-202(a)(2) (1991). The defendant's specific complaint is that the evidence was insufficient to establish that he was criminally responsible for the actions of Housler and insufficient to establish that Housler had the intent to rob the Taco Bell. This argument, however, overlooks the overwhelming evidence of the defendant's participation in the crimes.

Both Carl and Shawntea Ward testified that the defendant knew details of the Taco Bell murder otherwise known only to law enforcement officers, including the manner in which the perpetrator had entered and exited the restaurant, where the victims' bodies were located, how many shots had been fired, and the type of weapons used. Mr. Ward and Mr. Cooper saw the defendant load the shotgun and nine millimeter handgun before wiping his fingerprints from the weapons and placing them into a black book bag. During that time, the defendant wore white surgical gloves. The defendant also donned black clothing over a Miami Hurricanes sweat suit and told them that they would "never see" the black clothing again. Just a day prior to the murders, the defendant asked Mr. Peghee to allow him to examine the safe in the Ft. Campbell mail room and specifically asked Mr. Peghee if one could access the safe by shooting the dial with a shotgun. On that same day, the defendant asked Ms. Underwood if exiting the rear door of the Taco Bell would activate an alarm. The defendant's jacket was found on the bank of the Red River a short distance from the Taco Bell. Stains on the jacket tested positive as the blood of Mr. Campbell, and black plastic fragments found in the pocket matched black fragments from the dial of the safe in the Taco Bell. Nine millimeter cartridge casings found at the scene and bullets recovered from the bodies of Mr. Campbell and Ms. Klopp matched casings and bullets found in the defendant's residence. Shotgun shells recovered

from the scene matched those found at the defendant's residence and bore the same mechanism marks as the shotgun recovered from the defendant's residence. A bowling ball bag found in the defendant's car contained $2576 hidden under a bottom panel. Finally, the defendant's fingerprints were found on the door facing and ceiling vent cover in the men's restroom of the Taco Bell. Under these circumstances, the evidence was more than sufficient to support the convictions under either theory of guilt. *See State v. Lemacks*, 996 S.W.2d 166, 171 (Tenn. 1999) (holding that where there are separate theories of the defendant's guilt for a single offense based upon either direct or vicarious liability and the evidence is sufficient to support a finding of guilt under either theory, a general guilty verdict is sufficient).

*VIII. Inconsistent Theories*

The defendant next contends that the trial court violated his right to due process of law by "causing the State to proceed to trial in two cases on inconsistent theories." He asserts that by providing an instruction on criminal responsibility, the trial court "placed [the State] in the position of convicting two persons of aiding and abetting where there was no principal actor convicted." The State argues that the defendant has waived this issue by failing to present it in his motion for new trial and by failing to cite any authority for his position. We agree.

The defendant did not present this issue in his motion for new trial; thus, the issue has not been preserved for appellate review. *See* Tenn. R. App. P. 3(e) (stating that "in all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, . . . or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived"); *State v. Martin*, 940 S.W.2d 567, 569 (Tenn. 1997) (holding that a defendant relinquishes the right to argue on appeal any issues that should have been presented in a motion for new trial); *State v. Dodson*, 780 S.W.2d 778, 780 (Tenn. Crim. App. 1989). Moreover, although the defendant makes numerous citations to the record, he cites no authority for his argument that the trial court violated his due process rights. *See* Tenn. R. App. P. 27(a)(7) ("The brief of the appellant shall contain . . . [a]n argument . . . with citations to the authorities and appropriate references to the record (which may be quoted verbatim) relied on. . . ."); Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court.").

*IX. Especially Aggravated Robbery - Double Jeopardy*

The defendant asserts that separate convictions for especially aggravated robbery and felony murder violated double jeopardy principles. He contends that especially aggravated robbery should have been presented to the jury only "as an alternative to felony murder, or as a 'lesser-included' style of instruction." The State submits that the law is well-settled that dual convictions for felony murder and the underlying felony do not violate double jeopardy principles. We agree with the State.

-17-

Our supreme court first held in *State v. Blackburn*, 694 S.W.2d 934 (Tenn. 1985), that the imposition in a single trial of dual convictions for both felony murder and the underlying felony does not violate the constitutional prohibitions against double jeopardy. *Id.* at 936-37. Our appellate courts have continued to follow suit. *See, e.g.*, *State v. Barber*, 753 S.W.2d 659, 671 (Tenn. 1988); *State v. Zirkle*, 910 S.W.2d 874, 890 (Tenn. Crim. App. 1995); *State v. Johnson*, 781 S.W.2d 873, 884-85 (Tenn. Crim. App. 1989). The defendant is not entitled to relief on this issue.

## X. Instruction on Criminal Responsibility

The defendant also contends that the trial court erred by interrupting the jury's deliberations to provide an instruction on criminal responsibility for the conduct of another. He argues that the evidence was insufficient to support the instruction and that the manner in which the instruction was given led to confusion. He also asserts that the trial court should have allowed the parties to provide further argument to explain how the instruction fit with their respective theories of the case. However, the defendant has failed to cite any authority to support his claims. Tenn. R. App. P. 27(a)(7); Tenn. Ct. Crim. App. R. 10(b). Therefore, the defendant waived this issue.

Moreover, the record establishes that evidence introduced by the defendant resulted in the instruction. After the defendant objected to the instruction, the trial court observed that "the Defense introduced proof that gave rise to" the criminal responsibility instruction. The trial court stated, "The Defense put on all of the evidence that is in this record of Mr. Housler's involvement. The State did not put on any evidence that Mr. Housler was involved . . . ." We agree with this assessment. The trial court has a duty "to give a complete charge of the law applicable to the facts of a case." *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986) (citing *State v. Thompson*, 519 S.W.2d 789, 792 (Tenn. 1975); *see* Tenn. R. Crim. P. 30. This duty extends to every issue fairly raised by the evidence. *See Lester v. State*, 370 S.W.2d 405, 409 (Tenn. 1963). Here, the defendant put on evidence, including the "charge agreement," that raised the issue of Mr. Housler's involvement in the offenses. Once the issue was raised, the trial court was required to provide an instruction on criminal responsibility. Accordingly, the defendant cannot now be heard to complain about any error regarding the criminal responsibility instruction. *See also* Tenn. R. App. P. 36(a).

As to the timing of the instruction, we discern no error. Although the trial court's timing was not ideal, we cannot say that it caused the jury to place undue emphasis on the instruction. The record establishes that the jury had been deliberating only a short time when the trial court called the parties to the courtroom and indicated that it had "inadvertently omitted" an instruction on criminal responsibility. The trial court specifically informed the jury that the omission of the instruction in the earlier charge was unintentional and twice warned the jury not to place undue emphasis on the instruction. The jury is presumed to follow the instructions of the trial court. *State v. Smith*, 893 S.W.2d 908, 914 (Tenn. 1994). Accordingly, we reject the defendant's claims on this issue.

*XI. Heinous, Atrocious, and Cruel Aggravating Factor*

The defendant contends that the trial court erred by denying his motion to strike the "heinous, atrocious, and cruel" aggravating factor, *see* T.C.A. § 39-13-204(i)(5) (Supp. 1994), because the factor was not supported by the evidence. The State contends that the defendant has waived this issue by failing to cite to the record. In the alternative, the State asserts that the evidence was sufficient to support the aggravating factor.

When a defendant is convicted of first degree murder and the State does not seek the death penalty, the defendant shall be sentenced to a life in prison. *Id.* § 39-13-204(a), (f). The jury may determine that the life sentence shall be served with no possibility of parole if it finds unanimously and beyond a reasonable doubt that at least one statutory aggravating circumstance exists. *Id.* § 39-13-204(g)(2); -207(g). The "especially heinous, atrocious, or cruel" factor, relied upon by the State and found by the jury in the present case, is one such aggravating circumstance. *Id.* § 39-13-204(i)(5) ("The murder was especially heinous, atrocious, or cruel, in that it involved torture or serious physical abuse beyond that necessary to produce death[.]"). In this case, the trial court concluded that the evidence was insufficient to support the application of this enhancement factor on the basis of "torture" but ruled that it would allow the jury to consider the "serious physical abuse" portion of the aggravating factor.

We view the sufficiency of the evidence for an aggravating circumstance under the standards of *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781 (1979). Thus, we determine whether, after viewing the evidence in a light most favorable to the State, a rational trier of fact could find the aggravating circumstance beyond a reasonable doubt. *See State v. Williams*, 690 S.W.2d 517, 530 (Tenn. 1985). In recognition of the substantial discretion afforded jurors in determining which sentence to impose, the statute governing appellate review declares that a sentence of life in prison without possibility of parole shall be considered appropriate if the State proved beyond a reasonable doubt at least one statutory aggravating circumstance contained in Code section 39-13-204(i) and that the sentence was not otherwise imposed arbitrarily so as to constitute a gross abuse of the jury's discretion. T.C.A. § 39-13-207(g).

"The (i)(5) aggravating circumstance may be applied if the evidence is sufficient to support either torture or serious physical abuse beyond that necessary to produce death." *State v. Rollins*, 188 S.W.3d 553, 572 (Tenn. 2006); *State v. Suttles*, 30 S.W.3d 252, 262 (Tenn. 2000). With respect to "serious physical abuse beyond that necessary to produce death," our supreme court has said that the term "serious" alludes to a matter of degree and that physical, rather than mental, abuse must be "beyond that" or more than what is "necessary to produce death." *See State v. Nesbit*, 978 S.W.2d 872, 887 (Tenn. 1998).

Here, Doctor Harlan's testimony established that each of the victims suffered gunshot wounds in excess of what would have produced death. Notably, the evidence established that Mr. Campbell, Ms. Wyatt, and Ms. Price suffered either close or contact gunshot wounds to the head in addition to wounds to other parts of their bodies, including defensive wounds. The gunshot wounds

suffered by the victims supported the State's theory that the perpetrator entered the employee area of the Taco Bell in a "hail of lead" designed to incapacitate the victims and then, at some point thereafter, returned to execute the victims. Doctor Harlan testified that his findings were consistent with Ms. Price's twisting and turning during the initial shots. The placement of the shell casings indicated that the victims had attempted to escape the gunfire. Each of the victims suffered gunshot wounds that were, alone, non-fatal. This evidence supports the jury's finding that the murders were heinous, atrocious, or cruel in that the victims suffered serious physical abuse beyond that necessary to produce death.

## XII. Non-Statutory Mitigating Factors

The defendant also contends that the trial court erred by denying his requests for jury instructions on certain non-statutory mitigating factors. The defendant does not, however, identify those factors requested and denied. Further, he has failed to cite any authority in support of his arguments. Therefore, the defendant has waived our consideration of this issue. *See* Tenn. R. App. P. 27(a)(7); Tenn. Ct. Crim. App. R. 10(b). As the trial court observed in the order denying the motion for new trial, "[t]he only requests rejected by the [c]ourt were those deemed to be an incorrect statement of the law or previously determined inappropriate by the appellate courts." In addition, the trial court noted that it "liberally permit[ted] the jury to consider essentially everything in mitigation." Moreover, Code section 39-13-204 provides that "a reviewing court shall not set aside a sentence of death or of imprisonment for life without the possibility of parole on the ground that the trial court did not specifically instruct the jury as to a requested mitigating factor that is not enumerated" within the statute. T.C.A. § 39-13-204(e)(1). Most importantly, the defendant has failed to establish that any instruction that was requested and denied was supported by the evidence admitted at trial or at the sentencing hearing. *See State v. Thacker*, 164 S.W.3d 208, 230 (Tenn. 2005) (citing *State v. Odom*, 928 S.W.2d 18, 30 (Tenn. 1996)).

## XIII. Victim Impact Testimony

The defendant challenges the trial court's ruling allowing the State to present victim impact evidence because, he contends, such evidence was statutorily inadmissible at the time of the crimes. The State asserts that the defendant's claim is "patently untrue" because victim impact evidence is specifically permitted by statute.

The diametrically opposed positions of the State and the defendant can be attributed to the age of this case. The State is absolutely correct that under the current version of Code section 39-13-204, victim impact evidence is admissible during the sentencing phase of trial. T.C.A. § 39-13-204(c) (2006) ("The court shall permit a member or members, or a representative or representatives of the victim's family to testify at the sentencing hearing about the victim and about the impact of the murder on the family of the victim and other relevant persons. The evidence may be considered by the jury in determining which sentence to impose."). The defendant is also correct that the version of that same statute in effect at the time of his trial did not specifically provide for the admission of victim impact evidence. *See id.* § 39-13-204 (Supp. 1994). As the defendant

concedes, however, the use of victim impact evidence had been approved by both the state and federal Supreme Courts prior to the commission of the crimes in this case. *See generally Payne v. Tennessee*, 501 U.S. 808, 111 S. Ct. 2597 (1991); *State v. Payne*, 791 S.W.2d 10 (Tenn. 1990). Moreover, as indicated by our supreme court, the specific approval of victim impact evidence by *Payne* and also by *State v. Nesbit*, 978 S.W.2d 872 (Tenn. 1998), "did not change existing law" and instead "clarified existing practice in Tennessee relating to victim impact evidence." *State v. Reid*, 91 S.W.3d 247, 280 (Tenn. 2002). In light of these decisions, and given that the defendant does not argue that the testimony admitted during the sentencing hearing exceeded the scope of permissible victim impact evidence, the defendant is not entitled to relief on this issue.

*XIV. Consecutive Sentencing*

The defendant argues that the trial court erred by imposing consecutive sentences of life without the possibility of parole. He states that he "can find no evidence that the trial court arrived at and stated specific findings on the record in order to justify consecutive sentencing." The State contends that the defendant has waived this issue by failing to include the transcript of the sentencing hearing in the record on appeal. In addition, the State submits that the evidence supports the imposition of consecutive sentences on the basis that the defendant is a dangerous offender.

When a defendant challenges the length of a sentence, this court generally conducts a de novo review of the record with a presumption that the determinations made by the trial court are correct. T.C.A. § 40-35-401(d) (2003). This presumption, however, is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances. *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). The burden of showing that the sentence is improper is upon the appellant. *Id*. If the review reflects the trial court properly considered all relevant factors and its findings of fact are adequately supported by the record, this court must affirm the sentence, "even if we would have preferred a different result." *State v. Fletcher*, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). In the event the record fails to demonstrate the required consideration by the trial court, appellate review of the sentence is purely de novo. *Ashby*, 823 S.W.2d at 169.

In making its sentencing determination in the present case, the trial court, at the conclusion of the sentencing hearing, was obliged to determine the propriety of sentencing alternatives by considering (1) the evidence, if any, received at the guilty plea and sentencing hearings, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct involved, (5) evidence and information offered by the parties on the enhancement and mitigating factors, (6) any statements the defendant made in his behalf about sentencing, and (7) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-210(a), (b); -103(5); *State v. Holland*, 860 S.W.2d 53, 60 (Tenn. Crim. App. 1993).

When a defendant is convicted of multiple crimes, the trial court, in its discretion, may order the sentences to run consecutively if it finds by a preponderance of the evidence that a

defendant falls into one of seven categories listed in Tennessee Code Annotated section 40-35-115. They are:

> (1) The defendant is a professional criminal who has knowingly devoted such defendant's life to criminal acts as a major source of livelihood; (2) The defendant is an offender whose record of criminal activity is extensive; (3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences; (4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high; (5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims; (6) The defendant is sentenced for an offense committed while on probation; or (7) The defendant is sentenced for criminal contempt.

T.C.A. § 40-35-115(b) (2006). The existence of a single category is sufficient to warrant the imposition of consecutive sentences, *see State v. Adams*, 973 S.W.2d 224, 231 (Tenn. Crim. App. 1997), and indeed, "[e]xtensive criminal history alone will support consecutive sentencing," *id*. In *State v. Wilkerson*, 905 S.W.2d 933 (Tenn. 1995), the supreme court imposed two additional requirements for consecutive sentencing when the "dangerous offender" category is used; the court must find consecutive sentences are reasonably related to the severity of the offenses committed and are necessary to protect the public from further criminal conduct. *Id.* at 937-39; *see State v. Imfeld*, 70 S.W.3d 698, 707-08 (Tenn. 2002).

As the State correctly points out, the defendant has waived this issue by failing to include a transcript of the sentencing hearing. "When a party seeks appellate review there is a duty to prepare a record which conveys a fair, accurate and complete account of what transpired with respect to the issues forming the basis of the appeal." *State v. Ballard*, 855 S.W.2d 557, 560 (Tenn. 1993) (citing *State v. Bunch*, 646 S.W.2d 158, 160 (Tenn. 1983)). When the record "does not contain a transcript of the proceedings relevant to an issue presented for review . . . an appellate court is precluded from considering the issue." *Id.* at 560-61 (citing *State v. Roberts*, 755 S.W.2d 833, 836 (Tenn. Crim. App. 1988). Moreover, in the absence of a record to review, "the appellate court must conclusively presume that the ruling of the trial judge was correct." *State v. Draper*, 800 S.W.2d 489, 493 (Tenn. Crim. App. 1990); *see also State v. Oody*, 823 S.W.2d 554, 559 (Tenn. Crim. App.

1991). In the absence of the sentencing hearing transcript, we must presume that the sentencing decision of the trial court is correct.

Notwithstanding the absence of the transcript, the record otherwise supports a finding that the defendant fits within the dangerous offender category. The defendant entered the Taco Bell in what prosecutors termed a "hail of lead" firing more than 25 shots at his four co-workers. Additionally, consecutive sentencing is reasonably related to the grievous nature of the crimes in this case, and society needs to be protected from the defendant. The defendant is not entitled to relief on this issue.

CONCLUSION

Having conducted an exhaustive review of the voluminous record and the applicable law, we conclude that the defendant has failed to prevail on any of his claims. Although we do not condone the delay between the filing and the hearing on the motion for new trial, the defendant has failed to establish that the delay resulted in a due process violation. Because we can find no request in the record to reopen the hearing on the motion for new trial, we cannot say that the trial court erred by failing to do so. As to the presence of cameras in the courtroom, we are bound by the law of the case to hold that the trial court did not err by permitting the cameras. In addition, the defendant has failed to establish that the cameras "invaded" the deliberations of the jury. The defendant has waived challenges to the admission of DNA evidence, the qualification of a state witness as an expert in DNA identification, the admission of the testimony of the medical examiner, and the imposition of consecutive sentencing. Further, the defendant is not entitled to relief on his claims that the trial court should have changed venue, that convictions for felony murder and especially aggravated robbery violate double jeopardy principles, and that the trial court erred by providing an instruction on criminal responsibility for the conduct of another after the jury had begun to deliberate. The defendant has also waived claims that the trial court erred by admitting photographs of the victims, that the trial court violated his due process rights by forcing the state to proceed on inconsistent theories at his trial and the trial of his codefendant, and that the trial court erred by failing to instruct the jury on certain non-statutory mitigating factors. We also hold that the evidence was sufficient to support each of the defendant's convictions and to support the jury's application of the (i)(5) aggravator. Accordingly, the judgments of the trial court are affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE

-23-